***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the late Deputy Commissioner Hoag and Chief Deputy Commissioner Gheen and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Chief Deputy Commissioner Gheen, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. Employee is James Max Trantham.
2. Employer is Volvo Construction Company.
3. The carrier on the risk is American Protection Insurance Company.
4. All parties are properly before the Commission and the Commission has jurisdiction of the parties and of the subject matter.
5. At all relevant times, Volvo regularly employed three or more employees and was bound by the North Carolina Workers' compensation Act. An employer-employee relationship existed between Volvo and plaintiff on February 19, 1999, the date of the compensable injury.
6. A Form 60 dated March 26, 1999, was executed by Volvo, under the terms of which plaintiff was paid temporary total disability from March 12, 1999, until August 29, 1999.
7. In addition to the other stipulations, the parties stipulate and agree with respect to the following undisputed facts:
 Plaintiff sustained a compensable injury by accident to his back on February 19, 1999.
 Plaintiff was temporarily and totally disabled from his employment with Volvo from March 12, 1999, until August 29, 1999 and plaintiff received weekly benefits pursuant to N.C. Gen. Stat. § 97-29 during that time.
 Based on the Form 22 prepared by Volvo, on the date of the injury, plaintiff was employed at an average weekly wage of $811.35, which yields a compensation rate of $540.90.
8. Subsequent to the hearing, the parties stipulated to the following medical records, which are received into evidence and are identified as follows:
 Terence Fitzgerald, Ph.D., medical records, section V;
 Craig Brigham, M.D., medical records, section W; and
 Verne G. Schmickley, Ph.D., medical records, section X.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT A. Plaintiff's Background
1. Plaintiff was forty-two years old at the time of the first hearing before the Deputy Commissioner. He graduated from high school and obtained a degree in welding from Haywood Technical College. Despite his educational background, plaintiff functions at approximately a sixth grade level.
2. Plaintiff's employment history consists of welding for several employers over the course of fifteen years. Volvo employed plaintiff as a Welder 15 on September 11, 1995. The position at Volvo required "heavy" physical labor. Plaintiff maintained a good work record at Volvo, working a substantial amount of overtime. In the year prior to his work related accident, as detailed herein, plaintiff had a near perfect attendance record.
3. Plaintiff had a limited history of emotional problems. He was treated on one occasion in September 1984 for "nerve problems." Plaintiff's family physician noted at the time that plaintiff was depressed and reported suicidal ideation. These events coincided with the dissolution of plaintiff's first marriage.
4. Plaintiff had no additional treatment for emotional or psychological problems between the September 1984 incident and the date of his work related accident.
 B. Compensable Injury By Accident and Treatment
1. On February 19, 1999, plaintiff sustained an admittedly compensable injury to his lower back while manipulating a large sheet of steel weighing approximately 150 pounds. Plaintiff had no prior history of back injuries and his general health was good.
2. Plaintiff sought treatment for his back injury at Harris Regional Hospital Emergency Room the day after the accident. He returned again to Harris Regional on February 25, 1999, and was treated by Dr. Stephen Wilkinson. Dr. Wilkinson diagnosed acute traumatic back pain and removed plaintiff from work.
3. Plaintiff sought treatment from his family physician, Dr. Stephen P. Dewees. An MRI performed on March 10, 1999, revealed a moderately sized central herniated L5-S1 disc. Dr. Dewees referred plaintiff to Dr. Keith Maxwell (hereinafter "Dr. Maxwell"), an orthopaedic specialist.
4. On March 25, 1999, Dr. Maxwell diagnosed a central disc protrusion at L5-S1 with degenerative changes and mild disc desiccation changes at L4-5. Plaintiff's primary symptoms consisted of lumbar pain with some radiculopathy into the right leg. Dr. Maxwell prescribed physical therapy at Harris Regional and various medications. Plaintiff was removed from work for four weeks.
5. Physical therapy did not improve plaintiff's symptoms. Dr. Maxwell administered lumbar epidural blocks during subsequent appointments. Plaintiff demonstrated "a giving way in his back and leg," indicating symptom magnification. On May 20, 1999, Dr. Maxwell noted he did not think plaintiff was a surgical candidate. He did offer plaintiff the option of spinal fusion with an equal probability of success or failure.
6. Dr. Maxwell specifically noted that plaintiff was "crying and depressed [and] in desperate need of a multi-disciplinary pain program and functional restoration program."
7. Plaintiff was referred to Dr. Duff A. Rardin, a neurologist, on June 4, 1999. Dr. Rardin diagnosed mechanical low back pain and myofascial pain. An electrical stimulator and medications were prescribed, and vocational rehabilitation was recommended. Ultimately, Oxycontin was administered for pain. Dr. Rardin also noted "giveaway" qualities in his physical examination denoting symptom magnification.
8. Dr. Rardin obtained a functional capacity examination (FCE) on August 27, 1999. Based on the FCE, Dr. Rardin certified plaintiff at maximum medical improvement and released plaintiff for light duty work on August 30, 1999.
9. An additional FCE was performed on September 8, 1999, which concluded that plaintiff could perform at medium exertion levels, but would be unable to meet the physical demands of the Welder 15 position at Volvo.
10. Dr. Maxwell's concluding diagnosis was degenerative disc disease at L4-L5 and L5-S1 with symptom magnification. Dr. Maxwell believed that surgery would not alleviate plaintiff's condition. Dr. Maxwell, based on the FCE on September 8, 1999, certified plaintiff to return to work at light duty on September 14, 1999, despite the fact Dr. Maxwell's medical notes indicated medium duty. The following physical restrictions were imposed:
 limited bending, stooping and twisting to twenty pounds;
no lifting greater than thirty pounds;
no push/pull greater than one hundred pounds;
no sitting longer than two hours;
no standing longer than two hours;
limited walking to thirty minutes; and
change positions every one hour.
These restrictions clearly exceed the physical demands of a Welder 15 at Volvo.
11. Dr. Maxwell referred plaintiff back to Dr. Dewees, his family physician.
12. Plaintiff returned to modified work at Volvo in the Quality Assurance Department within his physical restrictions. The modified position, one not generally available in Volvo's employment structure, consisted of making paper files and general paperwork. Plaintiff left this modified position during the latter part of August 1999.
13. Plaintiff returned to Dr. Dewees' care on September 27, 1999.
14. Plaintiff began actively treating with Dr. James Jarvis, a pain medicine specialist at Sylva Pain Clinic, on October 14, 1999. Dr. Jarvis prescribed pain medications and muscle relaxants. Plaintiff consumed up to two to three hundred milligrams of Oxycontin per day. He had never taken Oxycontin or Morphine before and it produced substantial side effects. Plaintiff experienced mental confusion, which interfered with his judgment at work and ability to drive an automobile. For example, plaintiff developed a history of inadvertently driving to locations other than the location he intended.
15. Plaintiff saw Dr. Ralph C. Loomis, a neurosurgeon, on December 10, 1999. Plaintiff's principal symptom was lower back pain with numbness in the lateral upper right thigh. He had decreased range of motion in the back, as well as a positive straight leg raising test. Dr. Loomis did not believe surgery was a viable option. He imposed light duty physical restrictions of no lifting greater than thirty pounds.
16. Plaintiff sought emergency medical care at Harris Regional on January 4, 2000, for "knife-like" pain when driving and hitting a bump in the road.
17. Dr. Loomis interpreted an MRI performed on January 19, 2000, as revealing a central disc protrusion at L5-S1 without thecal sac or nerve root effacement and an annular bulge at L4-5 with a small annular tear. Plaintiff returned to Dr. Loomis on March 16, 2000, with continuing back pain and depression. Dr. Loomis recommended a psychiatric referral for depression. Plaintiff's light duty physical restrictions were maintained.
18. Plaintiff's psychiatric evaluation was performed by Terence Fitzgerald, Ph.D., a psychologist, on April 18, 2000. Dr. Fitzgerald's impression was that plaintiff was suffering from a pain disorder associated with both psychological factors and a general medical condition (degenerative disc disease of the lumbar spine).
19. Dr. Fitzgerald did not believe plaintiff was a good candidate for a procedure such as a pump implantation for pain control. Alternatively, he recommended a comprehensive work hardening program, preferably on an inpatient basis. It appears that Dr. Jarvis did not see this report prior to implanting a pump for pain management.
20. Dr. Jarvis referred plaintiff to Paul Fleischer, Ph.D., a psychologist, for treatment of depression. In an assessment dated May 11, 2000, Dr. Fleischer noted plaintiff appeared to have difficulty adjusting to chronic pain and financial pressures since the accident and seemed to be caught in a cycle of pain and worry.
21. Dr. Fitzgerald assumed the medical condition was a herniated disc as diagnosed by Dr. Jarvis. Objective testing indicated that plaintiff would be a "challenging patient due to long-standing coping mechanisms and his current emotional state. . . ."
22. Dr. Fleischer observed plaintiff's display of legitimate pain behaviors such as spasm, contortions of the body, and spontaneous sweating. In his opinion, these symptoms would be almost impossible to fabricate.
23. Dr. Fleischer did not believe other stresses in plaintiff's life, such as family problems, were causing plaintiff's condition because his premorbid functioning appeared normal. Plaintiff's adjustment disorder adversely affected how he coped with family dynamics, which were often poor. The record is replete with instances in which plaintiff reported family abuse toward him or plaintiff's alleged abusive conduct toward his family. Dr. Fleischer concluded that plaintiff's "emotional and physical health are inextricably intertwined, with his injury exacerbating his anxious and depressive tendencies, and his current depressed and anxious mood likely exacerbating the severity and maintenance of his pain."
24. Dr. Fleischer recommended short-term inpatient psychotherapy focused on stress reduction and treating plaintiff's depressive symptoms. He opined that this treatment would likely increase the effectiveness of plaintiff's physical rehabilitation and the probability that he could return to employment. In Dr. Fleischer's opinion, plaintiff's "treatment has been focused on pain management and depression, which seems to be secondary to an adjustment disorder from the chronic pain."
25. On August 4, 2000, Dr. Fleischer advised Dr. Jarvis that plaintiff's medication should be changed due to plaintiff's mental confusion and the danger it caused to him and others while driving. By mid-August, plaintiff was having extensive bouts of suicidal ideation. His psychiatric condition ultimately required hospitalization from August 30 through September 8, 2000.
26. Dr. Fleischer evaluated the need for an intrathecal pump and concluded it would be appropriate from a psychological viewpoint. Dr. Fleischer noted that the intrathecal pump did provide relief even though plaintiff experienced a significant period of withdrawal from oral pain medications. By mid-November 2000, plaintiff was reporting deceased back pain but numbness and burning in his legs during overexertion. Plaintiff considered returning to work.
27. Plaintiff's psychological improvement was not sustained. By March 2000, he was experiencing difficulty in managing emotions and stress. Plaintiff reported that his condition had improved since being on the intrathecal pump. Dr. Fleischer believes plaintiff was not at maximum psychological improvement when he last saw him on March 15, 2001.
28. Plaintiff continued to exhibit aberrant behavior. He would leave his home and arrive at locations, but could not remember or explain his reason for being there. On other occasions, he would go to a local store and be gone for three to six hours. Plaintiff's wife testified that he would sit in their home staring at the walls, saying they were melting, or seeing the flesh of his hand falling off. She observed that plaintiff seemed not to remember events for days at a time. Ultimately, plaintiff, who possessed a gun, appeared to be threatening suicide.
29. By August 24, 2000, plaintiff agreed to hospitalize himself. Plaintiff was admitted to Pardee Hospital as an inpatient on August 29, 2000. He remained hospitalized eleven days. Dr. C. P. Lowe, a psychiatrist at Pardee Hospital, reported diagnostic impressions as (1) major depressive episode, recurrent and severe; (2) chronic back pain; and (3) severe stress in dealing with chronic pain. Dr. Lowe recommended referral for pain management and adjusted plaintiff's medications.
30. On September 6, 2000, Dr. C. A. Buzzanell, a pain management specialist, administered bilateral sacroiliac joint injections under fluroscopy.
31. Dr. Jarvis, consistent with plaintiff's evaluation at Pardee Hospital, surgically implanted an intrathecal pump in plaintiff's back on October 5, 2000.
32. Plaintiff was readmitted to Pardee Hospital on October 20, 2000, for depression. Dr. F. B. Miller, a psychiatrist, treated plaintiff during admission to Pardee Hospital. The readmission was the result of plaintiff exhibiting rage toward his family and continuing suicidal ideation. Dr. Miller diagnosed (1) depression not otherwise specified; (2) chronic dysthymic disorder secondary to chronic pain syndrome; and (3) history of low back pain syndrome. His prognosis for plaintiff was poor. He opined: "This gentleman has pervasive characterological features and appears to have limited abilities to adapt in a productive manner."
33. Dr. Jarvis followed plaintiff's use of the intrathecal pump on a regular basis until May 2, 2001, his last visit with Dr. Jarvis. Morphine was initially employed, but morphine caused nausea and vomiting. Dr. Jarvis changed the medication to Dilaudid on December 30, 2000. Plaintiff's nausea diminished, but continued, as did his back symptoms. Dr. Jarvis left his practice in western North Carolina approximately two months prior to the first hearing before the Deputy Commissioner and relocated to Pennsylvania. Plaintiff continued his pain management with other doctors at Harris Regional Pain Clinic until August 2001.
34. Dr. Jarvis believes plaintiff's complaints of pain are genuine and that he has pain in the low back with right leg numbness. He opines that plaintiff is permanently and totally disabled with or without the intrathecal pump. Dr. Jarvis believes that treatment should consist of providing plaintiff with a better quality of life, as chronic pain affects the family and others around the patient. He assigned the following permanent physical restrictions:
maximum lifting, ten pounds;
maximum push/pull, ten pounds;
 no reaching above chest, overhead or away from body;
walking, no more than fifteen minutes;
standing, no more than fifteen minutes;
sitting, no more than fifteen minutes;
 no operation of machinery, kneeling, squatting, or bending;
 no operation of a motor vehicle greater than twenty miles; and
no climbing, stooping, crawling, or twisting.
Dr. Jarvis assigned a forty percent permanent partial disability rating, each, to plaintiff's spine, left and right upper extremities, and left and right lower extremities. Dr. Jarvis believes plaintiff may require future spinal surgery.
35. Randy L. Adams. a vocational rehabilitation expert, performed a vocational evaluation of plaintiff on June 6, 2001. He determined that plaintiff could perform light to medium duty work at best. In his opinion, plaintiff is totally disabled from performing any type of substantial gainful activity due to mental and physical impairments. Adams testified that if he were managing plaintiff's case vocationally, he would, if physically and psychologically safe, admit plaintiff to a pain center for detoxification, start functional restoration with physical therapy and a period of work hardening, followed with an FCE.
36. Dr. Cleveland Thompson assumed treatment from Dr. Jarvis and first treated plaintiff on August 17, 2001. His diagnosis was low back injury with chronic radiculopathy. Dr. Thompson testified that even lacking objective evidence of effacement of a nerve or thecal sac, some people who have no MRI evidence of effacement have nerve root pain. In addition, some individuals can have a "stretch" injury or chemical injury caused by disc leakage.
37. Had Dr. Thompson seen Dr. Fitzgerald's report, he would not have implanted an intrathecal pump, regardless of Dr. Fleischer's subsequent opinion. However, Dr. Thompson has continued the intrathecal pump as it is "marginally" helpful in relieving plaintiff's symptoms, even though the level of improvement is not as expected. Continued use of the intrathecal pump will be evaluated when the pump's battery requires replacement.
38. At his deposition on July 24, 2002 Dr. Thompson opined that plaintiff would require pain treatment for the foreseeable future.
39. Dr. Dewees continued to provide treatment for plaintiff, other than pain management.
 C. Work Status
1. The parties stipulated that plaintiff was temporarily and totally disabled from March 12, 1999, until August 29, 1999.
2. After he was released to return to work in September 1999, plaintiff returned to Volvo. He did not work regularly, working only one or two full weeks in the year following his return. He received full salary while working, even though he missed substantial periods from work.
3. Plaintiff has not attempted work at Volvo or any other employer since October 5, 2000, when Dr. Jarvis implanted the intrathecal pump.
4. Plaintiff is receiving long term disability benefits through Volvo. He has applied for Social Security disability benefits.
5. Plaintiff testified, corroborated by his wife's testimony, that he is suffering from increasing numbness and aching in his legs, swelling and tingling in his feet and ankles, and continuing pain in his lower back. The medication in his intrathecal pump still nauseates plaintiff and causes him to vomit several times a week. He uses Phernegan suppositories for nausea control. plaintiff sleeps one and one-half to two hours at a time. He consumes Aleve and Goody powders in addition to prescription medication for pain control. Overall, plaintiff has improved since implantation of the pump, including mental clarity.
 D. Independent Medical Evaluations
1. Plaintiff underwent a vocational evaluation by Adams on June 6, 2001, at the request of his Counsel. As a part of his evaluation, Adams administered several standardized tests. On the Beck Depression Inventory, plaintiff scored thirty-eight, placing him in the range of severe depression. His reading ability was at the sixteenth percentile of the general population, equivalent to the lower range of high school.
2. Based on review of the medical restrictions imposed by Dr. Jarvis at that time, and without consideration of plaintiff's psychological overlay, Adams opined that plaintiff was at maximum medical improvement and permanently and totally disabled. Adams admitted that his opinion would change if medical treatment reduced plaintiff's physical restrictions.
3. Adams recommends that if psychiatrically safe, plaintiff should be removed from all narcotics, assigned to physical therapy, and engage in work hardening. An FCE would be completed at the conclusion of this process. Adams believes that plaintiff will have to be retrained in a profession even under optimal conditions.
4. On February 7, 2002, plaintiff underwent an independent medical evaluation by Dr. Verne Schmickley. Dr. Schmickley's initial clinical impressions were somatoform disorder, depression, and possibly dependent personality features.
5. Dr. Schmickley administered a number of standardized tests. These tests confirmed a mild level of depression, not clinically significant depression. The depression scored significantly less than the same test administered by Adams. Plaintiff exhibited average levels of anxiety or somatic focus compared to other chronic pain patients. An MMPI administered showed mild to moderate elevation of scores for hypochondria, depression, and hysteria. These scores were less than those documented by Dr. Fitzgerald.
6. Dr. Schmickley finally diagnosed plaintiff with (1) pain disorder associated with both psychological factors and a general medical condition, and (2) mild and resolving depressive disorder, probably adjustment reaction with depressed features. Dr. Schmickley's findings are generally consistent with those of Dr. Fleischer.
7. Dr. Schmickley believes plaintiff can return to employment with a functional restoration program that includes cognitive behavior therapy for depression within plaintiff's medical restrictions. A vocational rehabilitation specialist would be required in support of the program.
8. On February 7, 2002, plaintiff submitted to a second independent medical evaluation by Dr. Craig Brigham. He opines that plaintiff has been over treated and is now addicted to narcotics. He concluded: "If it would help to resolve the case in his situation to obtain vocational training or more education, I think this could be a positive outcome. . . ." Dr. Brigham does not believe plaintiff is permanently and totally disabled.
 E. Operative Findings of Fact
1. The greater weight of the evidence establishes that plaintiff's cervical disc bulge is not producing plaintiff's back and radicular symptoms. As of the date of the last hearing before the Deputy Commissioner in this matter, surgery is not medically indicated.
2. Volvo's contention that the lack of a disc bulge impinging a nerve indicates plaintiff did not sustain an injury capable of producing chronic pain is not well taken. The greater weight of the medical evidence establishes that other physiologic mechanisms, such as a stretch or chemical injury, can produce chronic low back pain with radicular symptoms. Even Dr. Brigham, performing a consultative examination at Volvo's request, testified that the lack of disc compression of a nerve in the spine did not mean plaintiff was not experiencing pain.
3. The Full Commission finds that the evidence taken in its whole establishes that plaintiff sustained an injury resulting in chronic pain. Plaintiff had a good work record at Volvo prior to his injury, including a good attendance record. Nothing in the record suggests that he had a pattern of malingering or feigned lack of productivity; in fact, the record on these points is contrary.
4. The evidence clearly supports the conclusion that plaintiff's injury was superimposed on his pre-morbid marginal emotional adaptive skills. Dr. Fleischer's observation of plaintiff's emotional disorders early in the treatment process, superimposed upon a weak pre-morbid ability to cope with stress, suggest that plaintiff's physical and emotional conditions would be difficult to treat and would exacerbate each other. Unquestionably, plaintiff's injury may not have produced the profound emotional disturbance in others. However, plaintiff's poor adaptive skills have resulted in a distinct psychological component of injury.
5. The Full Commission finds that the evidence of record leads to a conclusion that plaintiff is suffering from a somatoform disorder and a physical injury, and the combination of the two conditions is producing profound physical and emotional symptoms. To the extent that plaintiff suffers from a somatoform disorder, a causative link to the injury at Volvo is clearly established.
6. Volvo's contention that the intrathecal pump surgically inserted by Dr. Jarvis was not medically reasonable is not well taken. The intrathecal pump has been FDA approved since 1983. Dr. Jarvis installed the intrathecal pump because plaintiff was not considered a candidate for surgery and had completed a gamut of conservative treatments for pain, including epidural steroid injections, oral medications, physical therapy, and work hardening without success.
7. Volvo correctly notes that at the time Dr. Jarvis implanted the pump, Dr. Fitzgerald's recommendation was against installing the device and subsequent medical specialists either questioned Dr. Jarvis' decision or stated they would not have installed the device. Volvo appears to contend that Dr. Jarvis actually received Dr. Fitzgerald's report, ignored it, and chose to solicit another favorable opinion. The evidence clearly supports a finding that Dr. Jarvis did not consider Dr. Fitzgerald's recommendation; however, the record does not support a finding that Dr. Jarvis received and ignored the recommendation.
8. Plaintiff's experience with the intrathecal pump demonstrates, however, that Dr. Jarvis was able to stop all of plaintiff's oral pain medications after implantation. Both objective testing and plaintiff's subjective reports confirm that plaintiff has improved since placement of the intrathecal pump. For example, Dr. Schmickley's psychological evaluation demonstrated that plaintiff had improved.
9. Taking the conflicting evidence in its entirety, Dr. Jarvis' decision to implant the intrathecal pump was a reasonable, if not uncontroversial, medical procedure at the time.
10. Dr. Thompson believes plaintiff's chronic pain is a permanent condition, and he will need continuing medical treatment.
11. The greater weight of the evidence establishes that plaintiff is in need of both continuing physical and psychological treatment.
12. Plaintiff's contention that he is permanently and totally disabled is not well taken. He has not reached maximum medical or psychological improvement. Except for Dr. Jarvis, or the consultative medical and vocational examinations relying on his opinions, medical specialists have consistently recommended physical therapy, psychological counseling, and vocational rehabilitation. Vocational rehabilitation may require retraining plaintiff for vocations that do not require heavy exertion.
13. The medical treatment and rehabilitation provided to plaintiff by the following health care providers was reasonably necessary to give plaintiff relief or lessen the period of his physical and psychological disabilities: Dr. Dewees; Dr. Jarvis; Dr. Fleischer; Dr. Fitzgerald; Pardee Hospital; Harris Regional; and Dr. Thompson.
14. At the time of the last hearing before the Deputy Commissioner, Dr. Thompson was designated as plaintiff's primary treating physician.
15. Plaintiff's medical and psychological treatment would benefit from active coordination. The Industrial Commission's Nursing Section should be assigned to assist in formulating current and future medical and psychological treatment as well as develop a rehabilitation plan.
16. Counsel for plaintiff have provided valuable legal services, including, but not limited to the preparation and trial of this workers' compensation action. A reasonable attorney fee is twenty-five percent of plaintiff's disability benefits awarded pursuant to this Opinion and Award.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff bears the burden of proving by the greater weight of the evidence an injury by accident, the existence of disability and its extent. Hendrix v. Linn-Corriher Corp., 317 N.C. 179, 345 S.E.2d 374
(1986). Plaintiff must prove by the greater weight of the evidence that (1) he is incapable of earning the same wages earned prior to the injury at Volvo, (2) he is incapable after the injury to earn the same wages earned prior to the injury at any other employment, and (3) his incapacity to earn wages is caused by the compensable injury. Phillipsv. U.S. Air, 120 N.C. App. 538, 463 S.E.2d 259 (1995). The Form 60 filed by Volvo establishes plaintiff's accident of February 19, 1999 as compensable but does not create a presumption of continuing disability.Effingham v. Kroger, 149 N.C. App. 105, 561 S.E.2d 287 (2002).
2. The Form 60 filed by Volvo establishes that plaintiff sustained an injury by accident on February 19, 1999, arising out of and in the course and scope of his employment. N.C. Gen. Stat. § 97-2(6)
3. As a result of his compensable injury, plaintiff was temporarily disabled from February 19, 1999, until August 29, 1999, as stipulated by the parties, and from October 5, 2000, when Dr. Jarvis surgically implanted the intrathecal pump and continuing. N.C. Gen. Stat. §§ 97-2(9) and 97-29. Plaintiff's psychological maladjustment to his physical injury has rendered him incapable of earning wages at Volvo or any other employment that is suitable based upon his age, education, vocational history, and residual functional capacity. Plaintiff's psychiatric injuries, superimposed on his pre-morbid lack of coping skills, are compensable. Calloway v. Memorial Mission Hosp.,137 N.C. App. 480, 528 S.E.2d 397 (2000). Totten v. City Of Reidsville(North Carolina Interlocal Risk Management Agency), I.C. Nos. 122467, 132856, 314820 (1997).
4. Plaintiff's weekly disability rate is $540.90 per week, as stipulated by the parties.
5. Volvo is responsible for payment of all medical care and rehabilitation efforts that effect a cure, provide relief, or lessen plaintiff's period of disability. Medical treatment must be "reasonably" related to plaintiff's compensable injuries. The medical treatment rendered by Dr. Jarvis, including the intrathecal pump, was reasonably related to plaintiff's compensable injuries to provide relief from his chronic lumbar and radicular pain. N.C. Gen. Stat. § 97-25;Fuller v. Wake County, I.C. No. 814493 (2002). The treatment rendered by Dr. Dewees; Dr. Fleischer; Dr. Fitzgerald; Pardee Hospital; Memorial Hospital; and Dr. Thompson are reasonably related to plaintiff's physical and psychological injuries. N.C. Gen. Stat. § 97-25.
6. Plaintiff's counsel, at hearing before the Full Commission, represented that defendants have failed to pay plaintiff's medical and rehabilitation expenses as ordered by Chief Deputy Commissioner Gheen by refusing to pay for the installation and maintenance of an intrathecal pump that is reasonably related to plaintiff's medical care. Defendants are to pay all medical expenses related to such care. N.C. Gen. Stat. § 97-25.
7. The Industrial Commission, in its discretion, may designate medical and psychological treatment. Therefore, Dr. Thompson is designated as plaintiff's primary treating physician. In addition, the Nursing Section of the Industrial Commission is designated to assist Dr. Thompson in developing a comprehensive plan of treatment, including plaintiff's physical, psychological, and rehabilitation requirements. N.C. Gen. Stat. § 97-25.
8. Plaintiff's counsel, at hearing before the Full Commission, represented that defendants have not made any attempt during this appeal to make disability payments to plaintiff, as awarded in the December 30, 2002, Opinion and Award of Chief Deputy Commissioner Gheen. Defendants are to pay to plaintiff a penalty equal to ten percent (10%) of all unpaid disability compensation installments that were not paid within 14 days after such installments became due. N.C. Gen. Stat. § 97-18(g).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Volvo shall pay plaintiff temporary total disability benefits at the rate of $540.90 from February 19, 1999, and continuing until further orders of the Industrial Commission. Volvo is entitled to an appropriate credit for disability payments, including those funded through an employer-funded plan, previously paid through August 29, 1999, and subsequent payment of wages by Volvo to plaintiff from August 29, 1999, until October 5, 2000. All disability benefits liquidated to the date of this award shall be paid in one lump sum. All unliquidated amounts shall be paid weekly. The Award of all disability benefits is subject to the reasonable attorney fees provided hereinafter. Volvo shall pay interest at 8 per cent per year from September 12, 2001, the date of the first hearing before the Deputy Commissioner, on all outstanding amounts until paid.
2. Volvo shall pay medical and rehabilitation expenses reasonably related to plaintiff's physical and psychological injuries, including but not limited to, the medical care providers designated in the above Findings of Fact. Volvo shall specifically pay the cost of installing, refilling, and maintaining plaintiff's intrathecal pump, for so long as such treatment is deemed medically necessary. All medical expenses are to be paid when the same are submitted to and approved by the Industrial Commission as provided by law and administrative regulations.
3. Dr. Thompson is designated as plaintiff's primary treating physician at this time and pending further orders of the Industrial Commission.
4. The Nurses Section of the Industrial Commission shall assign a nurse to assist Dr. Thompson in developing and coordinating plaintiff's medical, psychological and rehabilitation needs. Dr. Thompson shall, with the assistance of the Nursing Section of the Industrial Commission, present a report to the Full Commission within ninety days of the date of this Award specifying plaintiff's current needs for medical and psychological treatment, making specific recommendations as to an appropriate medical care for plaintiff's long term physical needs, psychological treatment, and vocational rehabilitation. A copy of this Opinion and Award shall be provided to Margaret Dunn, Section Head of the Nursing Section.
5. Defendants shall pay to plaintiff's counsel a reasonable attorney fee of twenty-five percent of the disability compensation awarded pursuant to this Award. Defendants shall deduct the attorney fee awarded from the liquidated sums owed plaintiff pursuant to this Award and pay the amount directly to counsel. Defendants shall pay the fourth check from all continuing disability benefits directly to plaintiff's counsel.
6. Defendants shall pay to plaintiff a penalty equal to ten percent (10%) of all unpaid disability compensation installments that were not paid within 14 days after such installments became due.
7. Defendants shall arrange for plaintiff to see a pain management or other inter-disciplinary medical specialist(s) at Bowman Gray School of Medicine for an evaluation of plaintiff's continued use of an intrathecal pump for pain management.
8. Defendants shall pay the costs, including expert witness fees.
This 7th day of August 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER